## Case No. 12,431.

SCAMMON v. BOWERS et al.

[1 Hask. 496.] [1]

District Court, D. Maine. Dec., 1873.

BANKRUPTCY — TITLE OF ASSIGNEE — GOODS PREVIOUSLY PAID FOR.

1. An assignee in bankruptcy takes only such title to the bankrupt estate as the bankrupt had.

---

[1] [Reported by Thomas Hawes Haskell, Esq., and here reprinted by permission.]

2. In equity, the purchaser of goods to be delivered as manufactured, may retain, as against the assignee in bankruptcy of the manufacturer, goods previously paid for and delivered to him after he knew that the manufacturer had become insolvent.

In equity. Bill by [John Q. Scammon] the assignee of a bankrupt to recover the proceeds of a large quantity of cigars received by the respondent, [Roscoe L.] Bowers, from the bankrupt, between April 15 and September 28, 1869, in fraud of the bankrupt act [of 1867 (14 Stat. 517)]. Answers were filed, setting up a lawful title to the cigars in Bowers, as purchased under a contract of April 10, 1869. The cause had been heard on bill, answer and proofs, and a decree rendered for the orator to the full extent of the prayer in his bill [Case No. 12,434], but a re-hearing is now awarded on motion of respondents. Abbott was adjudged bankrupt December 14, 1869, and is a party defendant to the bill. He resided in Saco and operated a factory for the manufacture of cigars. Bowers had kept Abbott's books from memoranda that he furnished usually at the close of each day's business.

[For prior proceeding in this litigation, see Case No. 10.]

Edward Eastman and Josiah H. Drummond, for orator.

Rufus P. Taply, for respondents.

FOX, District Judge. Bowers' rights depend on the agreement of April 10th, and upon what has taken place under it. This agreement, the court is not satisfied was in fraud of Abbott's creditors, and must therefore be considered as fair and legal, and Bowers is entitled to all the legal and equitable rights which spring from it. By it, in short, he was to purchase and pay for the product of Abbott's factory, and Abbott was bound to deliver the same. The prices for the various brands of cigars were fixed and determined upon between them, as a part of the contract. At the time this contract was made, Abbott was indebted to Bowers for monies advanced, which were paid by the cigars as they were delivered. Abbott afterwards was in advance, by delivery of his goods to Bowers, but the balance was soon changed, as on the first of August, Bowers was in advance to Abbott $2,434.83. In August Bowers received from Abbott in goods $5,668.50 and paid to him $4,954.14. In September, Bowers received $4,878 and paid $2,250. The goods thus received over and beyond the payments for the months of August and September to the amount of $3,342.26 are claimed to have constituted a preference in fraud of the provisions of the bankrupt act.

That Abbott was insolvent on the first of August and had been for a long time previous, at least as early as January, is admitted in Abbott's answer, although he claims he did not know or suspect such was his condition, and the other evidence in the case

fully establishes his insolvency at that date. Bowers denies that he had reasonable cause to believe Abbott was insolvent in August and September; but the court is well satisfied, that considering his intelligence and acquaintance with business, he must have at that time been fully aware of Abbott's condition. The entries made by him from time to time on Abbott's books clearly manifested that he was increasing his liabilities to an alarming extent, and that his assets were nearly all exhausted. The shifts which he resorted to under the ostensible pretence of consignment, indicated to any man of any business capacity, that his condition was desperate, buying large quantities of stock on time, and without manufacturing it, turning it over in very large quantities to Bowers as security on the advances of his notes.

The whole amount of goods so consigned was in excess of $10,000, and a portion of these by Abbott's books can be traced from the entries there made by Bowers. It appears, that June 18, Abbott purchased of Mr. Ellis goods to amount of $815.05, which at same valuation were consigned to Bowers June 21. On June 2, he bought of J. L. Dean $84 worth of goods, and June 21 of Wilder and Estabrook $682.50, which were consigned in same manner to Bowers June 23. On August 19, he bought of J. H. Feeney $1,014.65 and same day of Mr. Ellis $926.12, both of which lots were, August 21, consigned to Bowers. On August 19, he purchased from Wilder and Estabrook $1,020.15 of tobacco, which was consigned to Bowers August 25. These three last bills, amounting to $5,075.75, were paid for by a draft at sight in favor of Jos. Hobson, and nearly the whole amount was applied by Hobson in payment of his claims against Abbott for borrowed money, some of which had been due since December previous.

So likewise the sale to Joseph Hobson September 14 of stock to amount of over $5,600, and which has been the subject of inquiry in this court and adjudged fraudulent, was well known to Bowers, and the amounts received by him subsequently should be affected by his knowledge of the transaction, and were received by him when he could not but have known the condition of Abbott's affairs. Boothby's testimony most conclusively proves that Bowers was well aware of Abbott's condition August 20, and upon this branch of the case, the court has no doubt, that from the first of August, Bowers was conscious of Abbott's insolvency, and was desirous of procuring the goods from Abbott for which he had made his advances, and that from time to time, he made such further advances as were necessary to facilitate the manufacture of the stock on hand, continuing so to do, until by the agency of himself and Hobson, Abbott's whole stock, with the exception of about $1,500, was exhausted.

Abbott being insolvent, and these goods having been received by Bowers from him

when he was aware of such insolvency, can he hold them as against the assignee? At the former hearing the court was of opinion that he should not, and that the transaction constituted a preference in contravention of the bankrupt law. The able argument of the learned counsel at the re-hearing caused me to doubt the correctness of the views which I had previously entertained, and an examination of the authorities has satisfied me that I was in an error, and that under the agreement of April 10, Bowers had a right to require of Abbott the delivery of the goods which he had paid for, and by a proceeding in equity against Abbott, could have obtained a delivery of them if he had insisted on withholding them from him.

Under the agreement, it is probable that at law Bowers acquired no title to the goods until delivery; but in equity, I think a right to the goods, as they are manufactured and paid for, did attach in his behalf, which equity would enforce as against Abbott or his assignee. Fraud not being established, the assignee takes only the rights of the bankrupt, and he is affected by the same equities the bankrupt would be, in relation to the estate. Such is the doctrine as established in this circuit as I understand the authorities, and so the law must be administered until I am advised differently by the supreme court.

The question however here is not what would be the right of Bowers to receive this property from the assignee, but what were Bowers' rights as against Abbott at the moment of delivery of the goods. By the contract between these parties, the advances made by Bowers to Abbott, I think, did not create the ordinary relation of debtor and creditor, although of course, if Abbott refused to deliver the property, Bowers in an action at law could have recovered such advances. These sums, as between the parties. were not loans of money to be repaid, but they were payments on account of articles to be manufactured and delivered as wanted at fixed values. Bowers could not call upon Abbott to pay back to him the money advanced, but Abbott had a right to deliver to him the specific articles on account and for which the payments had been made. He had the right to tender him the article itself, if according to the agreement, and compel him to receive it. The agreement was originally executory, but by it the parties agreed, the one to buy, the other to sell the products of the factory. Bowers completes his portion of the agreement by paying for the articles which are subsequently produced, and such an agreement is in equity binding upon the parties and the property when it is manufactured, although the title of a bona fide purchaser without notice might be protected.

This executory agreement is a continuing one, resulting in a vested equitable right, so that when he gets possession of the prop-

erty, he does it under and by virtue of the agreement, and when delivered up to him by the other party, it is in pursuance and satisfaction of the original agreement, which is thus executed. Such a contract in equity carries with it all that is necessary to the completion of it. There was therefore an implied power and authority to demand and receive the goods as they were manufactured, and the "inevitable result must be, that a power, founded on contract to take possession of such goods of a particular nature as the owner of the power may subsequently manufacture or acquire, and hold them as the property of the owner, will confer an authority lying beyond the reach and control of the party by whom it is given, and entitle the person on whom it is conferred to take all the measures necessary to render it effectual for the end in view."

In Langton v. Horton, 1 Hare, 549, a mortgage of oil, to be caught, &c., was sustained in equity as against an attaching creditor. The vice-chancellor in his opinion says: "Is it true then that a subject to be acquired after the date of a contract cannot in equity be claimed by a purchaser for value under that contract? It is impossible to doubt, for some purposes at least, that by contract an interest in a thing not in existence at the time of the contract may in equity become the property of a purchaser for value. The course to be taken by such a purchaser to perfect his title, I do not now advert to." And in Mitchell v. Winslow [Case No. 9,673], a mortgage of all the tools, &c., which might be placed in a certain factory, was held to constitute an equitable lien as against the assignees of the mortgagors, and the mortgagees were authorized to retain the property of which they had taken possession after the insolvency. Judge Story says: "It seems to me a clear result of all the authorities, that whenever the parties by their contract intended to create a positive lien or charge, either upon real or personal estate. whether then owned by the assignor or contractor or not, or if personal property whether it is then in esse or not. it attaches in equity as a lien or charge upon the particular property as soon as the assignor or contractor acquires a title thereto. against the latter, and all persons asserting a claim thereto under him. either voluntarily or with notice or in bankruptcy."

A lien may exist, without any remedy for its enforcement, though in Sullivan v. Tuck, 1 Md. Ch. 59, where a person pledged his growing crops to his agent, who was to advance money and accept drafts drawn thereon, and the person died insolvent and largely indebted to his agent, the court granted a decree for a specific performance, and the crops were ordered to be forwarded to him. Here the question of how this lien or equity should be enforced by Bowers does not arise. Abbott recognized that it existed, carried out according to its terms his contract, de-

livered to Bowers the property, which under the contract and the payments he had made on account of it had in equity become Bowers' property, and I am now well satisfied that such a proceeding should not be adjudged in violation of any of the provisions of the bankrupt act, notwithstanding at the time that Bowers received the goods, he was well aware of Abbott's insolvency, and intended to protect himself from any loss by reason of the same.

In Nickerson v. Baker, 5 Allen, 142, it was decided that a subsequent delivery of a deed of real estate to the grantor, who had previously bargained for the land and paid for it, is valid although the grantor was then insolvent, and the party receiving the deed had reason to believe him to be so. The court says: "The grantor did not stand in the relation of · debtor to the plaintiff, he owed him no money nor was he liable to be charged for any indebtedness therefor. His only duty was to make the conveyance of the estate, for which the money was paid. Upon the payment of the entire purchase money to the vendor, in equity he held the estate in trust for the benefit of the party paying the same. The execution of the deed may, under the circumstances, be held to relate back to the time of payment of the money and the first existence of the duty to give a deed." These remarks it appears to me are as applicable to a contract for a sale of personal as well as of real estate; and I can entertain no doubt that if a party had paid his vendor the full purchase money for a ship at sea, and received an agreement that the vessel should be delivered and a bill of sale executed on her arrival, that equity might compel the performance of such a contract by the vendor or his assignee, if he should become bankrupt.

It is said, that this view is in conflict with Bank of Leavenworth v. Hunt, 11 Wall. [78 U. S.] 391, and the opinion of the supreme court as pronounced by Field, J. That was an action at law, and it was decided, that the assignee could recover from the grantee, the value of a stock of goods received by him from the bankrupt under an agreement to deliver the same as security when requested, made at the time of a loan of money, such delivery being long subsequent to the loan, and after the party had become insolvent, and a preference was thereby intended by the parties.

Such agreement did not amount to a conveyance, and no title passed thereby until the delivery. The conveyance being within four months of the bankruptcy proceedings, and being intended as a preference of an ordinary debt, was at law in violation of the bankrupt act, and could be invalidated by the assignee; and I believe most of the cases · in which the principle has been asserted, that a security subsequently executed in pursuance of a prior agreement can only take effect from its execution, are cases at law,

dependent on the strict legal rights of the party, and not proceedings in equity where equitable liens could be recognized and enforced. Such were Forbes v. Howe, 102 Mass., 427, and Simpson v. Carleton, 1 Allen, 109. These two authorities are sustained by the insolvent act of Massachusetts, which provided "that any security given for the performance of any contract, when the agreement for such security is part of the original contract, and the security is given at the time of making such contract, shall not be deemed a preference;" clearly implying, that the security to become effectual must be complete and perfect at the making of the original contract.

In Ex parte Ames [Case No. 323], Lowell, J., says: "Such an agreement merely amounts to an agreement to give a preference if one should become necessary. I have not seen or known of any case, which brings up the somewhat nicer question, whether specific and definite security, unconditionally stipulated for in writing, may be given after a lapse of time and change of circumstances. This may depend on whether the contract is one that a court of law or equity would enforce in invitum; for I apprehend and have often decided, subject to a correction that has not yet been made, that the assignee stands no better than the bankrupt in all matters of title, excepting where there is actual or constructive fraud."

Arnold v. Maynard [Case No. 561], was decided by Judge Story in 1842, and he then held, that a mortgage subsequently given in accordance with a verbal promise when the debt was contracted might constitute an act of bankruptcy. The next year, Mitchell v. Winslow [Id. 9,673], was decided by the same very learned judge, and it is quite clear that in his view there could be no conflict between the two cases.

To sustain mortgages, subsequently executed in accordance with a previous agreement, would certainly afford occasion for preferences in contravention of the provisions of the bankrupt act, and would be a means of constantly defeating the purposes of the act, and it may well be that a court of equity should not apply its broad doctrines to sustain agreements which are likely to produce such results, and thereby afford a preference to a creditor, contrary to the spirit· of the law; but the present case is entirely free from this objection, as the contract did not create the relation of debtor and creditor; but on the contrary, it was a purchase and sale, and payment for the property in advance, and so no debt existed to be preferred.

So far therefore as Bowers had paid for the goods he received, I think he is entitled to retain them or their value as against the assignee; but it appears, that he did not pay for all the goods thus received, but was indebted on that account in the sum of $1,007.-53, which amount he now claims to apply to

a balance due him on his consignment account. The last payment or advance made by him on that account was August 26, to Jos. Hobson, $5,075.75. That transaction was a loan, made when Abbott was insolvent, and Bowers was well aware of his condition and of the amount thus paid to Hobson; nearly all was for old debts, the payment of which was a preference; to allow Bowers now to apply to the consignment account the balance he has received from the sale of the cigars is clearly giving him a preference, which cannot be sanctioned under the bankrupt act; and as his claim to retain this amount is in fraud of the act, I am of opinion that the complainant may recover it in the present bill.

Decree accordingly.